UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

ALEXANDER ALHOVSKY,

                                        Plaintiff,

                v.                                          Civil Action

THOMAS RYAN, NEW YORK CITY POLICE
DEPARTMENT DETECTIVES STEVEN GOETZ AND        07 CIV 7628 (CM)
JOSE M. ALFONSO, NEW YORK CITY POLICE
DEPARTMENT OFFICERS SGT. PANUCCIO, PAUL,
MORNZANI AND GAVEN, JACK T. LINN, STEVE
SIMON, RAY BROWN, BARBARA JOYNER, the NEW
YORK CITY DEPARTMENT OF PARKS AND
RECREATION, and the CITY OF NEW YORK,

                                        Defendants.
-------------------------------------------------------------x


# PLAINTIFF'S MEMORANDUM OF LAW IN
# OPPOSITION TO DEFENDANTS' FRCP 56 MOTIONS


**ERLANGER LAW FIRM PLLC**
Attorneys for Plaintiff
100 Fifth Avenue, 14th floor
New York, New York 10011-6903
(212) 686-8045

## TABLE OF CONTENTS

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

PRELIMINARY STATEMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

       1.     Alexander Alhovsky. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

       2.     Alhovsky Absent-Mindedly Leaves his
              Balloon Pump in its Fanny Pack at Starbucks. . . . . . . . . . . . . . . . . . . . . . . . . . . 4

       3.     NYPD Called to Starbucks. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

       4.     NYPD Unconstitutionally Arrests, Unreasonably
              Uses Force Against and Detains Alhovsky. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

LEGAL ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

     POINT I

     RYAN'S FRCP 56 MOTION TO DISMISS
     ALHOVSKY'S §1983 USE OF UNREASONABLE
     FORCE CLAIM MUST BE DENIED. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

       A.    It is Premature to Dismiss Alhovsky's §1983 Excessive Force
           Claim Against Ryan for Lack of "Personal Involvement". . . . . . . . . . . . . . . . . 11

       B.    There are Palpable Issues of Material Fact Whether
           Ryan and the NYPD Used Unreasonable Force. . . . . . . . . . . . . . . . . . . . . . . . . 13

     POINT II

     RYAN'S FRCP 56 MOTION TO DISMISS
     ALHOVSKY'S FALSE ARREST CLAIM
     MUST BE DENIED AS A MATTER OF LAW. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

     POINT III

     ISSUES OF MATERIAL FACT REQUIRE
     THAT RYAN'S QUALIFIED
     IMMUNITY MOTION BE DENIED. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

i

A.    Ryan is not Entitled to Qualified Immunity
      on Alhovskys' §1983 False Arrest Claim. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

B.    Ryan is not Entitled to Qualified Immunity
      on Alhovsky's §1983 Excessive Force Claim. . . . . . . . . . . . . . . . . . . . . . . . . . 21

POINT IV

ALHOVSKY'S CLAIM FOR INTENTIONAL INFLICTION
OF EMOTIONAL DISTRESS MUST BE SUSTAINED IN
THE FACE OF CLEAR ISSUES OF MATERIAL FACT. . . . . . . . . . . . . . . . . . . . . 21

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

## TABLE OF AUTHORITIES

## CASES

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,, 106 S.Ct. 2505 (1986)................... 10

*Broughton v. State of New York*, 37 N.Y.2d 451, *cert. denied sub nom.*
*Schanbarger v Kellogg*, 423 U.S. 929 (1975)....................................... 15

*Calamia v. City of New York*, 879 F.2d 1025 (2d Cir. 1989). ..................... 13, 16, 20

*Curry v. City of Syracuse*, 316 F.3d 324 (2d Cir. 2003). ........................... 15, 21

*D.H. Blair & Co., Inc. v. Gottdiener*, 462 F.3d 95 (2d Cir. 2006)........................ 10

*Davis v. Kelly*, 160 F.3d 917 (2d Cir. 1998). ....................................... 12

*Disorbo v. Hoy*, 343 F.3d 172 (2d Cir. 2005). ...................................... 15

*D'Amico v. City of New York*, 132 F.3d 145 (2d Cir. 1998). ............................ 10

*Farrell v. Burke*, 449 F.3d 470 (2d Cir.2006). ..................................... 12

*Jeffreys v. City of New York*, 426 F.3d 549 (2d Cir. 2005). ............................ 10

*Kuehl v. Burtis*, 173 F.3d 646 (8th Cir. 1999)...................................... 16

*Meriweather v. Coughlin,*, 879 F.2d 1037 (2d Cir. 1989)............................... 12

*Oliveira v. Mayer*, 23 F.3d 642 (2d Cir. 1994), *cert. denied*, 513 U.S. 1076 (1995). ...... 19-20

*Papineau v. Parmley*, 465 F.3d 46 (2d Cir. 2006)............................... 13, 20-21

*Parkin v. Cornell Univ.*, 78 N.Y.2d 523, 577 N.Y.S.2d 227 (1991)....................... 16

*People v De Bour*, 40 N.Y.2d 210 (1976). .......................................... 16

*People v. Hoffman*, 135 A.D.2d 299 (3d Dep't, 1988). ................................ 16

*Provost v. City of Newburgh*, 262 F.3d 146 (2d Cir.2001). ............................ 12

*Russo v. City of Bridgeport*, 479 F.3d 196 (2d Cir. 2007)............................... 21

*Tellier v. Fields*, 280 F.3d 69 (2d Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241 (2d Cir. 2004). . . . . . . . . . . . . 10

*Wright v. Smith*, 21 F.3d 496, (2d Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

## **STATE STATUTES**

N.Y. Penal Law §240.62. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

## **OTHER AUTHORITIES**

Federal Rule of Civil Procedure 56(f). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 13

## PRELIMINARY STATEMENT

Plaintiff Alexander Alhovsky ("Alhovsky") filed an Amended Complaint alleging §1983 violations - deprivation of his rights to be free from an arrest and detention without probable cause and the use of unreasonable force during his arrest and detention – and state law claims for false arrest, and outrageous conduct causing severe emotional distress.[1]  These claims arise from his false arrest and detention and being subjected to the use of excessive force and psychological torturing during the arrest and detention, for allegedly placing a false bomb in a Starbucks.  The device, in fact, was an operable balloon pump that Alhovsky used to inflate balloons for children in Central Park but which he had absent-mindedly left at a counter.

Under this Court's Individual Rule 3.C., defendant Thomas Ryan ("Ryan") was entitled to move under FRCP 56 as to the §1983 claims on the grounds of a qualified immunity defense; the only discovery allowed after his service of the "bare" Notice of Motion was Alhovsky's deposition.  But without authority, Ryan has additionally moved for judgment on Alhovsky's state-law claims, apparently on the grounds that there are no issues of material fact as to those claims.  Ryan's relies on discovery material far beyond the pleadings and has thus sought to take unfair advantage of the Court's rule, which handcuffs Alhovsky from taking any discovery at this point.

Ryan's motion to be relieved from Alhovsky's §1983 excessive force claim under on the grounds that he was not "personally involved" must either be denied or continued for the lack of discovery under FRCP 56(f).  Personal involvement does not necessarily mean "direct

---

[1]   Alhovsky filed a Second Amended Complaint naming five NYPD detectives and police officers as defendants as to the §1983 Count only.  His separate claims against the Parks Department defendants have been resolved and a settlement agreement is being negotiated.

participation." A supervisor may be liable for the use of unreasonable force under §1983 where he gave orders and it could be inferred that he knew a constitutional violation would occur or he was grossly negligent in supervising the subordinate arresting officers. Ryan's supporting affidavit raises factual issues that he was an integral part of the detective group that was investigating Alhovsky's device and supervising his arrest and detention. Further discovery could reveal that Ryan knew that it was certain that a constitutional violation would occur and/or he was grossly negligent in supervising the arresting defendant officers.

Ryan secondarily claims as a grounds for relief from Alhovsky's §1983 claim that there is no material factual issue that Alhovsky was subjected to the use of unreasonable force. Simply put, if there is no such issue in this case, then the constitutional protection from the use of such force has little value. Given what the NYPD knew from three days prior to the arrest and detention, there was no grounds for its use of any force in arresting and detaining Alhovsky; the unreasonable force that was used could easily be inferred to be premeditated and malicious.

Ryan also moves for the dismissal of the state law false arrest claim on the grounds that the undisputed facts show that there was probable cause for Alhovsky's arrest under New York PL 240.62, "Placing a bomb or hazardous substance in the first degree." The "third" element of that statute requires that the false bomb is, in fact, an inoperable facsimile of or a bomb imitation. Because the NYPD Bomb Squad rendered the balloon pump inoperable on June 25 with a blue sprayed that impeded the flow of electricity, three days before Alhovsky's arrest, the NYPD could not have possibly known whether it was a functional device or an imitation bomb. Thus, *as a matter of law*, Ryan and the other defendants could not have had probable cause to arrest and detain him under PL 240.62. Moreover, given the information that the NYPD did know,

2

there was a perfectly innocent explanation for Alhovsky's leaving the balloon pump at Starbucks so that there was no information sufficient to support probable cause as to PL 240.62's intent element.

Ryan also moves for dismissal of the §1983 and false arrest claims under the doctrine of qualified immunity, the only motion that was authorized by the Court. Because there was no probable cause to support a charge against Alhovsky under PL 240.62, Ryan could *not* have believed that a reasonable officer would have arrested and detained Alhovsky even if such reasonable officer would not have done so under the circumstances. Further, given the facts and circumstances of the alleged crime committed, the lack of the alleged crime's severity, the lack of a threat of danger to the arresting officers and society, and that Alhovsky did not attempt to flee or evade arrest, there was no reasonably objective basis for using any force to arrest and detain him.

Finally Ryan and the other defendants attempt to sneak in an unauthorized motion to dismiss Alhovsky's intentional infliction of outrageous distress claim, under the "Qualified Immunity" section of Ryan's brief. If the Court entertains this portion of the motion given the posture of this case, there are clear issues of material fact whether Ryan and NYPD's conduct was outrageous and extreme, indeed, even premeditated and maliciously intended to injure and psychologically shock Alhovsky.

## STATEMENT OF FACTS

**1.    Alexander Alhovsky**

For many years, Alhovsky has worked in colorful outfits, inflating and shaping balloons and painting faces for children in Central Park ("the Park"). To inflate the balloons, he

3

purchased battery-powered balloon inflation pumps from the Majiloon website.  He also purchased black "fanny packs" to protect the balloon pumps and to allow him to conveniently carry them around his waist while inflating balloons.  An air hose, which Alhovsky decorated with colorful rainbow tape, protruded from the fanny pack with a nozzle and mini-activation switch attached at the end of the air hose. *See Rivera* Ex.R.  There was nothing threatening looking about the pump contained in the black fanny pack.

**2.     Alhovsky Absent-Mindedly Leaves his**
**        Balloon Pump in its Fanny Pack at Starbucks**

On or about June 25, 2006, Alhovsky had been working on Wallach Walk at the Park. Because the day had been slow, he was "spaced out" and "very tired." Alhovsky left the Park at about 5:30 p.m. and  biked toward his apartment.  His balloon pump was in its fanny pack strapped around his waist, his 26" x 18"portfolio case was strapped to his back, and his hamper with shaped balloons was attached to the bike's handle bars.  *Erlanger* Ex.1 at 83-86, 89.

At about 6:05 p.m., *Rivera* Ex.Q, Alhovsky stopped at the Starbucks at 1128 Third Avenue (66th Street) ("the Starbucks"), a few blocks from his apartment. *Erlanger* Ex.1 at 89. He had been going to the Starbucks steadily a few times a week for six or seven years. *Id* at 89-90; the Starbucks Shift Manager, Jazmin Archilla recalled seeing him there two to three times a week. *Erlanger* Ex.2.  Alhovsky purchased a coffee and a danish and sat at a countertop at the front of the store facing a window. *Erlanger* Ex.1 at 91; *Rivera* Ex.Q.  He was "really spaced out" and was trying to wake up from the day. *Erlanger* Ex.1 at 91.  He took off the fanny pack because it was heavy and he felt constricted, although he does not really remember where he placed it. *Erlanger* Ex.1 at 92.  Alhovsky left the Starbucks at about 6:18 p.m., *see Rivera* Ex.Q,

but absent-mindedly left the black fanny pack containing the balloon pump on the countertop. *Erlanger* Ex.1 at 93; *Rivera* Ex.Q.  He went home at fell asleep. *Erlanger* Ex.1 at 94.

During the four hours, between 6:18 p.m. and 10:10 p.m., that the black fanny pack was laying on the countertop in clear view at the front of the Starbucks, it apparently did not cause alarm or inconvenience to any customer or employee. *See Rivera Exs. D & Q.*

**3.     NYPD Called to Starbucks**

After the Starbucks closed, at around 10 p.m., the Shift Manager, called the black fanny pack to the attention of barista (counter worker), Antone Degrace, who opened it.  Thinking that the balloon pump was  a bomb, he threw the fanny pack onto the sidewalk in front of the store. Degrace then called "911"; police officers arrived shortly thereafter. *Id.* at D; *Erlanger* Ex.2.

During the evening of June 25 (three days before the arrest), NYPD detectives reviewed a security recording of the store. *See Rivera Ex. D.*  The time-stamped, still photographs of the recording, produced by the City, show Alhovsky in his multi-colored tie-died outfit ordering coffee, drinking it in a relaxed manner at a corner counter while looking out the window, and nonchalantly leaving the Starbucks about 13 minutes later (The recording has not yet been subpoenaed from Starbucks per the Court's individual rules). *Rivera Ex.Q.*  Over the course of the thirteen minute recording, the NYPD detectives observed a slightly built, non-threatening person, who did not exhibit any kind of threatening or unusual behavior.

During the evening of June 25 (three days before the arrest), the NYPD knew that no employee or customer at Starbucks had reacted in a negative way to the black fanny pack and its protruding air hose colorfully wrapped with rainbow tape during the entire four hours that it was sitting on the countertop. *See Rivera* Exs. D-G, I-M.

5

During the evening of June 25 (three days before the arrest), the NYPD knew from questioning Archilla that Alhovsky was a non-threatening, frequent customer, who came to the Starbucks two to three times a week, and on each occasion ordered a beverage, stayed a while, and then left. *Erlanger* Ex.2; *see Rivera* Exs.D & F.

During the evening of June 25 (three days before the arrest), the NYPD Bomb Squad quickly determined, through visual and radiographic examination, that the balloon pump did not contain anything of an explosive nature. *Rivera Ex.G.*  But before testing the balloon bump, the Bomb Squad had incapacitated it by spraying a blue substance on two terminals to impede the flow of electricity from the battery. *Erlanger* Ex.1 at 14-15; *see Rivera* Ex.E & R (blue-sprayed portions of balloon pump). Thereafter, the Bomb Squad was unable to determine whether the balloon pump was an operating device or an inoperative facsimile or imitation of a bomb. (Alhovsky filed a claim with the City for the damaged balloon pump, *Erlanger* Ex.1 at 14-15).

During the evening of June 25 (three days before the arrest), the NYPD knew that there had never been any problem or any threat directed at the Starbucks. *Rivera Ex.F; see Rivera Ex.D.*  There is no evidence that any threat had been directed at any other building or business in the surrounding area. *See Rivera* Exs. D-G, I-M.

The NYPD documents completed by the lead investigative detective from the 19th Precinct, Steven Goetz, do not show an investigation for the crime of "placing a false bomb." Rather, *prior to* Alhovsky's arrest, the 19th Precinct detectives were investigating a "Suspicious Device" *Rivera Exs. D, I-K.*

Alhovsky did not realize that the balloon pump had been missing until several days later when he looked for it.  He thought that it had been stolen from his apartment through an

unlocked window facing a fire escape, so he ordered a new balloon pump. Alhovsky never went back to the Starbucks to look for the balloon pump because he had no idea that he had left it there. *Erlanger* Ex1 at 94-97.

### 4. NYPD Unconstitutionally Arrests, Unreasonably Uses Force Against and Detains Alhovsky

Between June 25 and June 28, there were no communications between Alhovsky and the NYPD, Erlanger Ex.1 at 98, nor do the NYPD documents show that an attempt at communication was made. *See Rivera* Exs. D-G, I-M

On or about June 28, after working on Wallace Walk in Central Park, Alhovsky was riding his bike down 67th or 66th Street toward his apartment. A black fanny pack, with another balloon pump inside, was strapped around his waist, his black artist's portfolio bag was strapped to his back, and his multi-colored balloon hamper was attached to the handle bars. Alhovsky noticed that about eight blocks were "isolated"and that there were black, governmental-like Blazer cars "blocking everything." *Erlanger* Ex. 1 at 98-102; Rivera Ex.M. He wasn't paying particular attention or thinking that was going on related to him. *Erlanger* Ex.1 at 102.

As Alhovsky approached First Avenue, he noticed two cops on bicycles screaming at or addressing him. *Id.* at 102-103. One officer had a gun in his hand. Alhovsky did not think that they were referring to him. He never heard any officer yell "stop" or heard any officer identity himself, but then he realized that the screaming "might be relevant" to him so as he as approached, he slowed down. *Id.* at 105-106. Alhovsky saw a dark shadow approach him and was knocked off his bike. He felt a painful shock to a kidney, which "totally woke [him] up," and the impact of his shoulder with the ground, which made it feel dislocated. Alhovsky realized that something bad was happening to him and he "might not even survive this."

*Erlanger* Ex.1 at 102-105.

Three police officers were on top of Alhovsky (presumably the arresting officers, newly named defendants Paul, Mornzani and Gaven) and at least two guns were pointed at his face. One of the officers screamed at Alhovsky that he was going to "blow his fucking head off" while he was on the ground with an officer's knee in his face. One or more officers pulled Alhovsky up by his hair and slammed his face against the window of Chirping Chicken. *Erlanger* Ex.1 at 102-105, 112. His hands were handcuffed behind his back. *Id.* at 127. Alhovsky's pants were down around his ankles and a part of his underwear was down, exposing him to the kids in the playground across the street (some of whom were his clients). The officers were kicking him and his pants were dragging on the ground as they brought him to a police car. *Id.* at 113-114.

Alhovsky was "in shock." He did whatever the police officers wanted him to do, because he wanted them "to stop hurting [him]." It "was scary." *Id.* at 127.

Alhovsky was left alone in the rear of the police car, without air conditioning, for 40 minutes to an hour, a "long exhausting time." He was "freaking out" because no one would speak with him. Alhovsky courteously asked what was the reason for all of this but he was cursed out by police officers and told to "shut the fuck up." The NYPD cordoned off his fanny pack and portfolio on the ground with "yellow tape." *Id.* at 112, 114.

Alhovsky was then driven to the 19th Precinct and placed in an isolation room with a table and lots of glass that he could not look though. *Id.* at 115, 129. His pockets were emptied and shoe laces removed. *Id.* at 129-130. Alhovsky was locked in alone for "a very, very long time." Two detectives then came into the room, playing a "good cop, bad cop" routine; one was very rude, and mean (presumably Goetz) and Ryan was "more sensible." Neither detective

8

would disclose the reason for Alhovsky's arrest. Alhovsky asked Goetz for a hint, like was it murder or rape and was told, "you're in far deeper shit than this, buddy, and you're going in for life." *Id.* at 115-116.

Alhovsky was hoping the nightmare would be over. His mind was racing and his heart was pounding. One of the detectives came in and told Alhovsky that they were expecting a "bigger fish" from a three-letter agency ("the agent"), but other than that, told him nothing and totally ignored his attempts to communicate. *Id.* at 116-117.

At some point man dressed in a suit, with a gold, not a police badge, came into the room; Alhovsky believed him to be the agent. He asked Alhovsky two questions, "what is this and where did you get it?" Alhovsky simply told the agent that it is a "balloon pump" and directed him to the Majiloon website where he bought his balloon pumps. The detectives and the agent started looking for an internet accessible computer at the Precinct. Once one was found one, they accessed the Majiloon website, and saw the balloon pump and its construction "vividly" depicted. *Id.* at 117-118.

After the detectives and the agent had reviewed the Majiloon website, Alhovsky was placed back into the isolation room for another period of time. Ryan asked him to sign a waiver to allow the NYPD to search his apartment. He told Alhovsky that if he did not sign, NYPD would get it anyhow, it would take longer, and Alhovsky would be completely exhausted by that time; Alhovsky signed it. *Id.* at 120-121.

Alhovsky was never told that NYPD believed that a bomb was left a Starbucks. He had no idea of even why he was being asked about the balloon pump, and his first thought was that he had left it at the Park and they had found it. Alhovsky still had no idea that he had left the

9

balloon pump at Starbucks. *Id.* at 121.

When Alhovsky left the 19th Precinct with the detectives, it was dark outside. After they arrived at his apartment building, at about 10 p.m., he was told to wait down a flight of stairs from his apartment while it was searched. Two police officers remained with Alhovsky at all times. The search lasted for about an hour. It was only after all of this that Alhovsky was allowed to go into his apartment alone. *Id.* at 131-133.

Alhovsky's arrest under PL 240.62 was subsequently voided. *Rivera* Ex.L.

## LEGAL ARGUMENT

On a summary judgment motion, the moving party has the burden of producing evidence showing that there are no material issues of fact for trial; if the moving party does not meet this burden, the motion must be denied even if the nonmoving party provides no evidentiary evidence in opposition. *Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004); *accord D.H. Blair & Co., Inc. v. Gottdiener*, 462 F.3d 95, 100 (2d Cir. 2006). A fact is material "when it 'might affect the outcome of the suit under the governing law'." "An issue of fact is genuine if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party'." *Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005)(citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49, 106 S.Ct. 2505 (1986)). Thus a Court may grant summary judgment only where no rational jury could find in favor of the non-moving party. *D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998).

The evidence must be construed in a light most favorable to and all reasonable inferences drawn in favor of the moving party. Assessments of credibility and weighing evidence are for the jury. *Jeffreys*, 426 F.3d at 553.

10

Under FRCP 56(f) when the opposing party establishes by sworn statement that it cannot present facts to oppose the motion for specified reasons, the Court may deny the motion or grant a continuance.

Defendants served their "bare" Amended Notice of Motion under FRCP 12(c) or FRCP 56 on the grounds of qualified immunity *only* on November 14, 2007. Briefing was scheduled by the Court and later extended. The Notice "activated" the Court's Individual Practice 3.C, which stayed all discovery, other than FRCP 26 initial disclosure and Alhovsky's deposition. But defendants are also now moving on other grounds, using the Court's individual practices as a shield and a sword. The first two Points of defendants' motion and the sneaky argument "C" under the third Point seek relief under Rule 56 on grounds other than qualified immunity, in reliance on material that goes far beyond the pleadings.

### POINT I.

### RYAN'S FRCP 56 MOTION TO DISMISS ALHOVSKY'S §1983 USE OF UNREASONABLE FORCE CLAIM MUST BE DENIED

Alhovsky's §1983 claim as to Ryan is based on two grounds: (1) Alhovsky was deprived of his liberty without due process of law through his arrest and detention and (2) Alhovsky was not subjected to the use of excessive force while being arrested and detained. *Rivera* Ex.A ¶¶49-50. Defendants' motion only goes to (2), i.e., Alhovsky's §1983 *use of unreasonable force* claim against Ryan. For the reasons set forth below, Ryan's argument on these grounds must be rejected.

**A**.     **It is Premature to Dismiss Alhovsky's §1983 Excessive Force Claim Against Ryan for Lack of "Personal Involvement"**

11

Ryan argues that there can be no excessive force claim against him because he was not "personally involved" in the use of force in arresting Alhovsky, i.e., he had arrived at the scene after Alhovsky had been arrested and handcuffed.  While personal involvement in alleged constitutional deprivations is a prerequisite to a damages award, such determination is an issue of fact. *Farrell v. Burke*, 449 F.3d 470, 484 (2d Cir.2006)(citing *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994)).  Personal involvement does not necessarily mean "direct participation" as Ryan claims here. *Provost v. City of Newburgh*, 262 F.3d 146, 154-55 (2d Cir.2001).  A supervisor may be liable under §1983 where he gave orders for others to follow and it could be inferred that he knew a constitutional violation would occur. *Meriweather v. Coughlin,*, 879 F.2d 1037, 1046 (2d Cir. 1989).  Supervisory liability may be also shown where there was grossly negligent supervision of subordinates who committed the alleged constitutional violations. *Wright*, 21 F.3d at 501.

As the Second Circuit observed in *Davis v. Kelly*, 160 F.3d 917 (2d Cir. 1998), the dismissal of  §1983 claim against a defendant supervisor might be appropriate only after discovery is completed because subordinates might produce evidence that they acted at the supervisor's instruction:

> After an opportunity for discovery, undisputed allegations that the supervisor lacked personal involvement will ultimately suffice to dismiss that official from the case, [citation omitted] but such dismissal is premature where the opportunity to identify those involved has not yet been accorded. Indeed, in some instances, their identification might produce evidence from them that they acted at the supervisor's instruction, thus putting in issue the supervisor's denial of personal involvement.

169 F.3d at 921-22.

12

Ryan's supporting affidavit raises factual issues that he was an integral part of the detective group that was investigating Alhovsky's device and supervising his arrest and detention.  Further discovery could reveal that Ryan knew that it was certain that a constitutional violation would occur and/or he was grossly negligent in supervising the arresting defendant officers.  As this Court did not allow Alhovsky to take Ryan's deposition prior to his responding to this motion (by "so ordering" defendants' June 2 letter), and Alhovsky cannot not adequately oppose it, see FRCP 56(f), this prong of the motion must either be denied or continued.

**B.    There are Palpable Issues of Material Fact Whether**
**Ryan and the NYPD Used Unreasonable Force**

Under the facts of this case, it is simply astounding that Ryan has the audacity to claim that there is no issue of fact as to the NYPD's unreasonable use of force.  If there is no such issue here, then the constitutional protection from the use of such force has little value.

Whether there was an unreasonable use of force must be determined by what was objectively reasonable given the facts and circumstances confronting the arresting officers; the facts and circumstances include the crime committed, the crime's severity of the crime, the threat of danger to the arresting officers and society and whether the suspect attempted to flee or evade arrest. *Papineau v. Parmley*, 465 F.3d 46, 61 (2d Cir. 2006).  Where law enforcement officers are cooperating in an investigation, the knowledge of one is presumed to be shared by all. *Calamia v. City of New York*, 879 F.2d 1025, 032 (2d Cir. 1989)(citations omitted).

Three days prior to Alhovsky's arrest, the NYPD knew that the balloon pump was not a bomb and there was no immediate threat to the public. The alleged crime, violation of PL 240.62, was not severe given that: (1) no customer or employee had shown alarm or been inconvenienced

13

during the four hours that the black fanny pack with the colorful protruding air hose had been sitting in plain view on the Starbucks's countertop and (2) no threats had been directed at Starbucks or any other business in the area.  The NYPD also had detailed and substantial information, from interviewing the Starbucks employees and its security recording, that Alhovsky was not physically threatening or threatening in behavior.  Why then didn't the NYPD do exactly what this Court had asked at the initial Scheduling Conference on November 30: find and interview Alhovsky and simply ask him what the device was? *Erlanger* at ¶5.

Instead, the NYPD engaged in a "take down a terrorist" exercise.  Alhovsky was riding his bike with his black fanny pack around his waist, his portfolio strapped to his back, and his multi-colored balloon hamper on the handle bars as he passed the Starbucks at Third Avenue and 66th Street about 4:30 p.m. on June 28, three days after he had left the balloon pump at Starbucks.  Although he noticed a suspicious isolation about the area and black government cars parked around, he did not relate any of this to him.  At about the Chirping Chicken on First Avenue and 66th Street, he saw officers running toward him and pointing guns.  He saw a black shadow and was tackled to the ground off of his bike, kneed in the kidneys, and had at least two guns pointed at his head while he was on the ground with three officers on top of him.  One of the officers screamed at Alhovsky that he was going to "blow his fucking head off" while he was on the ground with an officer's knee in his face.  Alhovsky was handcuffed, pulled up off the ground by his hair and had his face slammed against the window of the Chirping Chicken.  His pants were down around his ankles and part of his underwear was down, exposing him to children in the playground across the street, some of whom were his clients in the Park.  The officers were kicking Alhovsky and his pants were dragging on the ground as they brought him to

14

a police car.  Alhovsky was left alone in the rear of the police car, without air conditioning, for 40 minutes to an hour, a "long exhausting time."  He courteously asked what was the reason for all of this but he was cursed out by police officers and told to "shut the fuck up."

Ryan and the NYPD's conduct under the circumstances raise far more than issues of material fact whether unreasonable force was used.  The use of any force was unreasonable under the circumstances and it could easily be inferred that the NYPD's conduct was premeditated and maliciously intended to injure and psychologically shock Alhovsky.

Ryan's further argument that excessive force was not used, because Alhovsky only suffered a few bruises, goes to damages, not liability. *See Disorbo v. Hoy*, 343 F.3d 172, 183 (2d Cir. 2005).  In any case, Alhovsky has claimed physically injury in addition to the much more serious Post traumatic stress syndrome. Erlanger ¶6.

### POINT II.

### RYAN'S FRCP 56 MOTION TO DISMISS ALHOVSKY'S FALSE ARREST CLAIM MUST BE DENIED AS A MATTER OF LAW

Ryan claims that there was probable cause to arrest Alhovsky under PL 240.62.  The "third" element of that statute requires that the false bomb is, in fact, an inoperable facsimile of or a bomb imitation.  Because the NYPD Bomb Squad had rendered the balloon pump inoperable on June 25 with blue spray, three days before Alhovsky's arrest, no one could have possibly known whether it was a functioning device or a bomb imitation.  Thus, *as a matter of law*, on this basis alone, Ryan and the other defendants could not have had probable cause to arrest and detain Alhovsky on June 28 under PL 240.62.

Where the arrest was made without a warrant, the officer has "acted extrajudicially" and

the presumption arises that the arrest and imprisonment were unlawful. *Curry v. City of Syracuse*, 316 F.3d 324, 335 (2d Cir. 2003); *Broughton v. State of New York*, 37 N.Y.2d 451, 456-458, *cert. denied sub nom. Schanbarger v Kellogg*, 423 U.S. 929 (1975).   The existence of probable cause must be determined under the "totality of the circumstances," and where law enforcement officers are cooperating in an investigation, the knowledge of one is presumed to be shared by all. *Calamia*, 879 F.2d at 1032.

"Equivocal behavior, or that which is susceptible of innocent as well as culpable behavior, will not constitute probable cause." *People v. Hoffman*, 135 A.D.2d 299, 302 (3d Dep't, 1988)(citing *People v De Bour*, 40 N.Y.2d 210, 216 (1976)).  "There must be a founded suspicion predicated on specific articulable facts that criminal activity is afoot." *Hoffman*, 135 A.D.2d at 302 .  Facts that may support further investigation do not necessarily provide the grounds for probable cause to support an arrest. *Id.*  In the absence of exigent circumstances and so long as law enforcement would not be unduly hampered, police officers must make a reasonably thorough investigation prior to an arrest; probable cause does not exist when minimal further investigation would exonerate a suspect. *Kuehl v. Burtis*, 173 F.3d 646, 650 (8th Cir. 1999).

The existence of probable cause may decided by the court *only where* there is no real dispute as to the facts <u>or</u> the proper inferences to be drawn from the facts, *Parkin v. Cornell Univ.*, 78 N.Y.2d 523, 529, 577 N.Y.S.2d 227 (1991).

Diligent research has uncovered no case which interprets, N.Y. Penal Law §240.62.  To be found guilty for placing a false bomb in the first degree, the device: (1) must have been placed in a public place; (2) by its design or construction appeared to have been a bomb; (3) *was in fact*

16

an inoperable facsimile or bomb imitation; and (4) was known or intended to be or reasonably

believed to have appeared as a bomb by the person who placed it:

> **§ 240.62 Penal. Placing a false bomb or hazardous substance in the first
> degree** A person is guilty of placing a false bomb or hazardous substance in the
> first degree when he or she places, or causes to be placed, in or upon school
> grounds, a public building, or a public place any device or object that by its
> design, construction, content or characteristics appears to be or to contain, a
> bomb, destructive device, explosive or hazardous substance, **but is, in fact, an
> inoperable facsimile or imitation of such a bomb, destructive device,**
> explosive or hazardous substance and which **he or she knows, intends or
> reasonably believes will appear to be a bomb, destructive device**, explosive or
> hazardous substance under circumstances in which it is likely to cause public
> alarm or inconvenience...

(emphasis added).  The only undisputed fact is that the balloon pump was left in a public place,

albeit inadvertently.

The NYPD, by its own conduct, had no information upon which to base a belief whether

the operable balloon pump, *was in fact, an inoperable facsimile* of a bomb or destructive device

or a functioning device.  This is because the Bomb Squad on June 25, three days before

Alhovsky's arrest rendered  it inoperable.  Because of this fact, police officers cannot point to a

single articulable fact that would have led them to believe that the device was an inoperable

facsimile as opposed to one of thousands of innocent, operable devices powered by a 18-volt

battery.  It must be inferred that this is precisely why Detective Goetz (now a defendant), wrote

in his reports in the box CRIME/CONDITION and elsewhere in those documents, "Investigate

Suspicious Device" (only the Bomb Squad, which had rendered the balloon pump inoperable,

used the self-serving term "hoax device").  Thus, as a matter of law, defendants could not have

had probable cause to arrest Alhovsky under PL 240.62.

There is further a clear issue of material fact whether any detective or police office could

have believed that Alhovsky knew or intended or reasonably believed that the balloon pump
would appear to be a bomb.  It may be from inferred from the still photographs that were
produced from the Starbucks security tape viewed by the NYPD on the evening of June 25, three
days before Alhovsky's arrest, that Alhovsky exhibited nothing more than equivocal or innocent
behavior.  The still photographs show Alhovsky in his multi-colored tie-died outfit ordering a
beverage, drinking it in a relaxed manner at a corner counter while looking out the window, and
nonchalantly leaving the Starbucks about 13 minutes later.  The NYPD knew from questioning
the Starbucks Shift Manager that Alhovsky was a non-threatening, frequent customer, who came
to the Starbucks two to three times a week, and on each occasion ordered a beverage, stayed a
while, and then left.  His behavior on June 25 was entirely consistent with what the NYPD was
told about his behavior on the many prior occasions that he had frequented Starbucks.

    Moreover, it may be inferred that there was nothing about the fanny back that invited
further inquiry because for the four hours between 6:18 p.m., when Alhovsky left the balloon
pump on the countertop at Starbucks, and about 10:10 p.m., when the barista Degrace called
"911," not a single customer or employee showed any alarm or inconvenience.

    During the evening of June 25, three days before Alhovsky's arrest, the NYPD also knew
that there had never been any problem or threat directed at the Starbucks and there were no threat
at the time against any other building or business in the surrounding area.  And the NYPD
documents completed by Goetz, the lead investigative detective from the 19th Precinct, do not
show an investigation for the crime of "placing a false bomb," but rather, an investigation of a
"Suspicious Device."

    Defendants correctly identified the facts underling the probable question issue at the end

18

of their argument (Defendants' Memorandum at 12): Ryan needed to conduct a further investigation and therefore "needed" to bring Alhovsky to the Precinct for questioning about the device he had left at the Starbucks on June 25.  The mere fact that police officers could not explain what the device, in the face of facts showing the probability of innocent conduct, only provided grounds for further investigation, not an arrest.

Even if, for the sake of argument, defendants could show that probable cause existed for Alhovsky's arrest, once the NYPD had reviewed the Majiloon website, probable cause for the PL 240.62 charge clearly no longer existed.  At that point, Alhovsky should have been released. Instead, the NYPD illegally detained him for another few hours.  He was put back into the isolation room, coerced into signing the release to search his apartment, brought to his apartment building in the custody of at least three police officers, and kept in the custody of two police officers down the stairway during the hour that his apartment was (needlessly) searched.

## POINT III.

### ISSUES OF MATERIAL FACT REQUIRE THAT RYAN'S QUALIFIED IMMUNITY MOTION BE DENIED

The general rule is that an officer is entitled to qualified immunity if: (1) his conduct did not violate a clearly established constitutional right or (2) it was objectively reasonable for the officer to believe that his conduct did not violate such right. *Oliveira v. Mayer*, 23 F.3d 642, 648 (2d Cir. 1994), *cert. denied*, 513 U.S. 1076 (1995).  Immunity should only be decided by the Court where the facts "concerning the availability of the defense are undisputed," otherwise the jury must decide the issue. *Oliveira*, 23 F.3d at 649.

19

**A.    Ryan is not Entitled to Qualified Immunity
on Alhovsky's §1983 False Arrest Claim**

Alhovsky's constitutional right to be free from a warrantless arrest or detention in the absence of probable cause is well-established, *Oliveira*, 23 F.3d at 648.    As to the second prong, did Ryan reasonably believe that a reasonably prudent police officer would have made an arrest, even though a reasonably prudent officer *would not have* made an arrest. *Oliveira*, 23 F.3d at 649.    The belief that a reasonably objective officer would have made an arrest for a particular crime must be tested against whether there were known facts which supported the individual elements of the crime. *See Papineau*, 465 F.3d at 59.

All of the NYPD's collaborative investigative work is imputed to Ryan and the others. *Calamia*, 879 F.2d at 1032 (where law enforcement officers are cooperating in an investigation, the knowledge of one is presumed to be shared by all).    For the reasons fully elaborated upon in Point II above, neither Ryan nor any other NYPD detective or officer could have reasonably believed that a reasonably objective NYPD officer would have arrested Alhovsky for committing a crime under PL 240.62 (even if a reasonable officer would not have arrested Alhovsky). Simply put, the NYPD had no information from June 25 to June 28 which supported a key element of the crime (bomb imitation).    It had other information for three days that clearly pointed to an innocent explanation for Alhovsky's leaving the balloon pump at Starbucks, or certainly information that created no more than a suspicion.

It may even be inferred that Ryan and Goetz knew that they could not determine whether the balloon pump was a functioning device or bomb imitation because the Bomb Squad had incapacitated it.    The qualified immunity defense is simply not available where the arresting

officer may have knowingly violated the law. *See Tellier v. Fields*, 280 F.3d 69, 85 (2d Cir.

2000).

**B.    Ryan is not Entitled to Qualified Immunity
       on Alhovsky's §1983 Excessive Force Claim**

Alhovsky's constitutional right to be free from the government's use of excessive force

during an arrest or detention is well-established. *Russo v. City of Bridgeport*, 479 F.3d 196, 212

(2d Cir. 2007); *Papineau*, 465 F.3d at 61.  Whether there was an excessive use of force must be

determined by what was objectively reasonable given the facts and circumstances confronting the

arresting officers; the facts and circumstances include the crime committed, the crime's severity

of the crime, the threat of danger to the arresting officers and society and whether the suspect

attempted to flee or evade arrest. *Papineau*, 465 F.3d at 61.  Where material factual issues exist

as to the use of excessive force on the facts alleged by Alhovsky, the qualified immunity motion

must be denied. *Id.* at 63.  Qualified immunity motions have been denied where a suspect's

behavior was more egregious than here. *See, e.g, Curry*, 316 F.3d at 327-28 & 335-36.

For the reasons fully elaborated upon in Point I B. above, there are very clear factual

issues whether the NYPD engaged in a "take down a terrorist" exercise in a premeditated and

malicious assault on Alhovsky's rights.

**POINT IV.**

**ALHOVSKY'S CLAIM FOR INTENTIONAL INFLICTION
OF EMOTIONAL DISTRESS MUST BE SUSTAINED IN
THE FACE OF CLEAR ISSUES OF MATERIAL FACT**

Ryan and the other defendants attempt to sneak in an unauthorized motion to dismiss

Alhovsky's intentional infliction of outrageous distress claim, under the "Qualified Immunity"

21

section of Ryan's brief (sub-Point "C"), primarily on the grounds that Alhovsky cannot show outrageous and extreme conduct by the NYPD defendants. If the Court entertains this portion of the motion given the discovery posture of this case, as elaborated upon in several of the Points above, there are very clear issues of material fact whether the NYPD's conduct was outrageous and extreme, indeed, even premeditated and maliciously intended to injure and psychologically shock Alhovsky.

Considering that the NYPD could have easily found Alhovsky and asked him what the device was, its executing a "take down a terrorist" exercise was outrageous in character and extreme in degree. The unreasonable force visited on Alhovsky during his arrest, given the information that the NYPD had for three days, was outrageous in character and extreme in degree. NYPD's use of the good cop, bad cop routine and its complete failure to even explain to Alhovsky why he had been arrested, brutally manhandled and detained during, the six-hour ordeal on June 28, was outrageous in character and extreme in degree.

Finally, whether the intentional tort claim and the "traditional tort" state law false arrest claim overlap in remedy is a decision that can be made before trial, so that there are no duplicative claims before the jury. It is premature to dismiss the intentional tort claim now on such basis.

## <u>CONCLUSION</u>

Plaintiff Alexander Alhovsky respectfully submits that this Court must deny defendants'

FRCP 56 motion in its entirety, and that he be granted such other and further relief as the Court

deems just and proper.

Dated: June 9, 2008
      New York, New York

                       ERLANGER LAW FIRM PLLC
                       Attorneys for Plaintiff

                       By: <u>s/ Robert K. Erlanger</u>
                           Robert K. Erlanger (RE-0886)

                       100 Fifth Avenue, 14th floor
                       New York, New York 10011-6903
                       (212) 686-8045